UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:18-cv-413-JLB-NPM

COREY MILLEDGE,
                    Plaintiff,
v.

WILLIS, et al.,
                    Defendants.
_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, WARDEN WILLIS, ASSISTANT WARDEN WILLIAMS, CAPTAIN BARRETT, SERGEANT TRAUPMAN, SERGEANT GAHRMANN, OFFICER COTTE, OFFICER DISCHIAVO, SERGEANT CHERRY, and OFFICER BROOKS ("Defendants"), file this Motion for Summary Judgment and Statement of Facts, pursuant to Rule 56, L.R. 3.01, and ECF 102 pg3.

### A.  INTRODUCTION

Plaintiff, COREY MILLEDGE, a pro se inmate with Florida Department of Corrections ('FDC') filed this §1983 Complaint against these FDC employees. Plaintiff alleges three incidents:

1) *The Conversation*: Plaintiff alleges failure to protect as to WILLIS and WILLIAMS claiming he verbally complained to both of them on August 11, 2017 regarding a fear of Dischiavo and Traupman [ECF 1, pg 11, ¶ 4] [Exhibit T, pg. 37, ln. 2-25, clarifies date as August 11th]

2) *The Training Room:* Plaintiff alleges failure to intervene as to BARRETT, and excessive force as to TRAUPMAN, COTTE, DISCHIAVO, and CHERRY claiming that on August 15, 2017 in the afternoon, Dischiavo, Traupman, Cherry, and Cotte, used excessive force upon him in the training room while Barrett watched and failed to intervene and then Dischiavo used excessive force on the way to medical. [ECF 1, pg 12, ¶5-10]

3) *The Evening Callout* Plaintiff alleges excessive force as to BROOKS, and failure to intervene and deliberate indifference to medical need as to GAHRAMAN claiming Brooks used excessive force on him in medical and at his cell the evening of August 15, 2017 while Gahrmann watched and failed to intervene, and then Gahrmann was deliberately indifferent to Plaintiff's medical need for injury to his hands and fingers. [ECF 1, pg 15 ¶11-16]

### Leave to Amend

Due to outstanding motions, Defendants request leave to file an Amended MSJ, when said motions have been ruled upon. See ECF Numbers: 230, 231, 232, 236, 240, 243, 244.

### Conventional Filing

Defendants have filed a motion to conventionally file the video of the incident from August 15, 2017. [ECF 248]. If granted, Defendants will submit the video to the Court forthwith.

### B.  DEFENDANTS' STATEMENT OF MATERIAL FACTS

All exhibits include a citation to a Bastes Stamp page number located on the bottom right side of each page as "BS# __". An index is attached hereto.

1.      In 2008, Plaintiff was sentenced to FDC custody for 15 years for battery, battery on law enforcement, and contraband in a detention facility. (Exhibit A, Inmate Detail BS# 2)

2.      In August 2017, Plaintiff never approached Willis and Williams seeking protection from officers Dischiavo and Traupman. On August 11, 2017, between 11:30 am and 4:00 pm, Williams was in her office reading, drafting, and sending sixty (60) emails in total. (Exhibit B, Willis BS# 11, ¶12) (Exhibit C Williams Aff. BS# 15 ¶3-4)

3.      On August 15, 2017, at 2:50 p.m., Dischiavo and Officer Sperling[1] were on the compound by the mess hall when they saw Plaintiff holding his groin area with a black string tied around his

---

[1] Sperling was an officer with FDC, and was not a named party to this action.

wrist. Plaintiff was ordered to submit to a pat search and a seven-inch homemade knife was found in Plaintiff's pants by his waistband area. The knife was photographed. (Exhibit D, Incident reports BS# 26, 28 details incident sections)(Exhibit E, Dischiavo BS# 55 ¶ 9)(Exhibit F, Knife BS# 61)

4.      The activities building houses the captain's office, a bathroom, and a training room. The bathroom connects the office and training room. (Exhibit G Barrett Aff. BS# 62, ¶2;  BS# 63 ¶ 9a-e) (Exhibit H, Photos BS# 68-71)

5.       Plaintiff was ordered to partake in a strip search. When an inmate is being strip searched, he would be uncuffed. Upon entering the bathroom area, Plaintiff refused orders to comply with the strip search, began cursing and yelling, became visibly agitated, started to move around, and then rushed at Dischiavo and attempted to strike him in the midsection. Dischiavo redirected Plaintiff to the floor, chest first, and force was stopped. (Exhibit D, Incident Report BS# 24, 26, 28) (Exhibit E, Dischiavo BS# 55 ¶9) (Exhibit G, Barrett Aff. BS# 62 ¶2)

6.      Plaintiff would have been uncuffed and had no shirt on because he was being searched. Plaintiff did not have leg shackles on. (Exhibit G, Barrett Aff. BS 64, ¶10) (Exhibit H, Photos BS 68, 71) (Exhibit W Video time 1:40, 2:30)[2]

7.      Only **three** people were present during this incident; Plaintiff, Dischiavo, and Sperling. (Exhibit J, Use of Force BS# 87 Comments and participant sections) (Exhibit D, Incident BS# 25)

8.      Officer Barrett was not physically on the prison grounds immediately prior to responding to this incident. At 2:52 p.m. Cotte received a call to respond to the activities building in order to record a reactionary physical use of force. Cotte, along with Barrett, responded and found Plaintiff on the floor and under the control of Dischiavo and Sperling. The recording began at 2:56 p.m. (Exhibit D Incident BS# 23, 30, 26, 28) (Exhibit G, Barrett BS# 63 ¶ 8) (Exhibit H, Photos BS#

---

[2] See ECF 248, Motion to Conventionally File Video with MSJ, pending.

68) (Exhibit I, Cotte Affidavit BS# 81 ¶ 2-6) (Exhibit W Video)

9.      Dischiavo and Sperling brought Plaintiff to his feet, walk him through the small bathroom area, then into the captain's office, and then outside. (Exhibit G, Barrett BS# 63 ¶ 9a-e) (Exhibit H, Photos BS 68-71) (Exhibit W, Video 00:01 – 1:34)

10.     Plaintiff was brought to medical for a post use of force exam. Other than Dischiavo, Sperling, Cotte, and Barrett, no one else was present in the training room. Traupman and Cherry were never present. (Exhibit D, Incident BS# 30, 26, 28) (Exhibit E, Dischiavo BS# 55 ¶9) (Exhibit G, Barrett BS# 62, ¶5) (Exhibit H Photos BS# 68-71) (Exhibit I Cotte BS# 81 ¶9) (Exhibit K, Traupman Affidavit BS# 88 ¶2-5) (Exhibit L, Cherry Affidavit BS# 89 ¶2-6) (Exhibit W, Video)

11.     Barrett and Cotte never witnessed any excessive force, never partook in the application of force. Barrett and Cotte's first interaction with Plaintiff began with him already under the control of Dischiavo and Sperling, as recorded. (Exhibit G, Barrett BS# 62 ¶¶2-9) (Exhibit I, Cotte BS# 81 ¶4-11)

12.     Traupman never escorted Plaintiff from food services to the Activities Building; Traupman was never present with Plaintiff in the captain's office, bathroom, nor training room. Traupman never applied nor witnessed any use of force on Plaintiff on August 15, 2014. (Exhibit D, Incident BS# 30, 25, 26, 28) (Exhibit E, Dischiavo BS# 55 ¶9) (Exhibit J, UOF BS# 87 middle, participant section) (Exhibit G, Barrett BS# 62, ¶5) (Exhibit H, Photos BS# 68-71) (Exhibit I, Cotte BS# 81 ¶9) (Exhibit K, Traupman BS# 88 ¶2-5)

13.     Cherry had no involvement with Plaintiff in regard to any use of force upon him on August 15, 2017. Cherry was never present with Plaintiff in the captain's office, bathroom, nor training room. Cherry never applied nor witnessed any use of force on Plaintiff on August 15, 2017. If Plaintiff was being strip searched, as a female officer, Cherry, as a female, would especially not

have been present. (Exhibit D 30, 26, 25, 28) (Exhibit E, Dischiavo BS# 55 ¶9) (Exhibit J, UOF BS# 87 middle, Participant section) (Exhibit G, Barrett BS# 62, ¶5) (Exhibit H, Photos BS# 68-71) (Exhibit I, Cotte BS# 81 ¶9) (Exhibit L, Cherry BS# 89 ¶2-6)

14.     The facility was short staffed that day, which resulted in the use of Dischiavo and Sperling transferring Plaintiff to medical. Barrett stated on the video, "I don't have any other certified staff at the moment, so I am going to utilize the two officers who were initially involved in the use of force, uh, to escort this" inmate. (Exhibit W, Video 1:17)

15.     Plaintiff refused to identify himself to officers during the incident and provided a different DC number belonging to another inmate. (Exhibit W, Video 1:17, 1:32; 9:09 9:40)

16.     On the way to medical, Plaintiff turned and spit on Dischiavo's forehead. Dischiavo struck Plaintiff in the back of his head with an open hand, brought Plaintiff to the ground, and force was stopped. (Exhibit D, BS# 30, 24, 26-29) (Exhibit E, Dischiavo BS# 55 ¶9) (Exhibit G, Barrett BS# 63, ¶9g - 9j) (Exhibit H, Photos BS# 72-76) (Exhibit I , Cotte BS# 82 ¶11) (Exhibit W, video 4:11)

17.     Plaintiff was brought to medical. In medical he threatened the nurses because they would not remove his spit shield. (Exhibit D, 23, 26) (Exhibit __ Video, time 12:43)

18.     Plaintiff was brought to the showers awaiting a regular cell at which point Plaintiff declared, falsely, he had a 'psych emerg[ency]'. (Exhibit D, 24) (Exhibit __ Video 14:00, 14:55)

19.     All force seen on the video was deemed to be in compliance with FDC rules and procedures. (Exhibit D, Incident BS# 26 'Review' section)

20.     Plaintiff was evaluated by a nurse at 3:02 p.m. and it was noted that he had two abrasions to his forehead, measuring, 1cm x 1cm and 1cm x 3cm. The injuries were superficial and did not break the skin. Plaintiff was evaluated in the left rib area, and he complained of pain on a level of 2 out of 10, with 10 being the worst. Plaintiff's skin was not red, bruised, or swollen. (Exhibit M,

Aff. Nurse Caswell BS# 91 ¶6-11) (Exhibit N, Medical BS# 248, 257, 258) (Exhibit J, UOF BS# 85 bottom section- IC post event, BS# 87 top section-Inmate injuries) (Exhibit D Incident, BS# 24, Reported Injuries Inmate)

21.     Later the same day, while in confinement, Plaintiff declared a psychological emergency and was escorted to and from medical by Officers Brooks and Plumley without any problems or issues. Brooks never used any force on Plaintiff on August 15, 2017. Brooks never closed the flap on Plaintiff's hands and fingers. (Exhibit O, Brooks Roggs BS# 262-264 ¶ 6, 8, 9, 13)

22.     Gahrmann was working in the control room, often referred to as 'the bubble', during the time Brooks brought Plaintiff to medical. (Exhibit O, Brooks BS# 264, ¶13) (Exhibit P, Gahrmann Affidavit BS# 265 ¶2)

23.     Gahrmann never saw Brooks nor Plumley use any force upon Plaintiff. Even if Gahrmann had seen any force being used on Plaintiff, as he was the only person in the control room, he would not have been permitted to leave the control room due to the safety and security of the prison. (Exhibit P, Gahrmann BS# 265 ¶ 4-7)

24.     On August 15, 2017, Plaintiff never complained to Gahrmann about injuries to his hands or fingers, or any other type of injury. Had Plaintiff sought medical attention, Gahrmann would have ensured the he was seen by medical. (Exhibit P, Gahrmann, BS# 266, ¶8 -10)

25.     Plaintiff did not file an informal grievance regarding claims against Brooks and Gahrmann., Instead, Plaintiff filed a direct appeal, #17-6-35690, regarding claims against Brooks and Gahrmann which was **denied** due to being improperly filed. (Exhibit Q, Grievances BS# 269 Response, BS# 270-272 Grievance) (Exhibit R, Appeals, BS# 303-306)

26.     Plaintiff never filed a grievance claiming Dischiavo and Traupman made threats to him prior to August 15, 2017. (Exhibit Q Grievances, BS 267- 298, absence of grievance) (Exhibit R,

BS 299-335, absence of appeal)

27.    Plaintiff only filed a grievance indicating that on August 15, 2017, *t*hat Traupman claimed that Plaintiff was always 'getting slick' while Traupman was allegedly bringing him to the captain's office. Plaintiff does not claim Traupman made this statement before then. (Exhibit Q, Grievances BS# 275)

28.    Plaintiff never filed a grievance claiming failure to protect regarding alleged complaints made to Willis and Williams between August 1, 2017 through September 31, 2017. (Exhibit Q Grievances, BS# 267- 298, absence of grievance) (Exhibit R, BS# 299-335, absence of appeal)

29.    Plaintiff did not include any complaints about: a) threats made by Dischiavo ever; b) threats made by Traupman prior to August 15, 2021, c) failure to protect as to Willis and Williams; d) excessive force by Brooks, e) failure to intervene by Gahrmann, and f) deliberate indifference to medical need by Gahrmann in his formal grievance. Plaintiff only filed grievance #1708-510-164, which pertained only to the instance in the training room and was marked as approved, as being sent to the Inspector General's office. (Exhibit Q, Grievances BS # 274 – 276)

30.    The Inspector General's Office closed the investigation on the basis that the conduct alleged was 'pursuant to procedure and or rule, lack of credible or factual information to support allegation'. (Exhibit S, Insp General BS# 361).

31.    Plaintiff admits that he did not file an informal grievance regarding #1708-510-164 and instead filed the matter directly as a formal grievance.  (Exhibit Q, Grievances BS# 274, 1st para.)

32.    Plaintiff admits he suffers from mental health that causes him to feel "sad, anger, hopeless, fearful, scared, depressed, and paranoid think[s] that the officer and inmates are out to get me" (Exhibit R, Appeals, BS# 334)

33.    Prior to August 15, 2017, Plaintiff was diagnosed by mental health as suffering from

adjustment disorder, disturbances of conduct, poly-substance dependence, depressive disorder, impulsive disorder, and antisocial personality disorder. He has a history of claiming false psych emergencies to seek certain types of housing; he has a violent pattern of behaviors and requires security presence at all times Plaintiff previously claimed "I have to say what I have to say to get a transfer. If I act like an asshole long enough, then I will get a transfer." (Exhibit N, FDC Medical records, BS# 202)

34.    On March 16, 2017, Plaintiff cut himself with a razor. (Exhibit N, Medical BS# 201-201)

35.    On August 3, 2017, Plaintiff was seen by medical for left shoulder pain and thoracic [middle] back pain, with a pain level of 7 out of 10. (Exhibit N, Medical BS# 250, 252)

36.    On August 17, 2017, Plaintiff sought a medical appointment for eye, rib, and back pain and made no claims or injury regarding his hands or fingers. He then refused to be seen by medical on August 17 and 25, 2017. (Exhibit N, Medical BS# 197 198, Requests; BS# 195, 196, 199, Refusals)

37.    On August 30, 2017, Plaintiff refused staff orders and was able to physical lift his mattress and covered his cell window with it to resist chemical agents. (Exhibit S, IG BS# 338-339)

38.    On August 30, 2017, at 11:12 p.m. into August 31, 2017 12:19 a.m., Plaintiff refused to submit to hand restraints, had chemical agents applied, necessitated a forced cell extraction team of five men to remove him, and refused to submit to a strip search while concealing contraband. Plaintiff was seen in medical and did not complain of rib pain. (Exhibit N, Medical K, BS# 245, 256) (Exhibit S, IG BS# 363, 365, 366)

39.    On August 31, 2017, at 9:00 a.m. plaintiff was seen in medical for self-inflicted wounds to his arms. Plaintiff did not complain of rib pain. (Exhibit N, Medical BS# 246)

40.    On September 11, 2017 Plaintiff was seen by medical for re-opening his wounds. Plaintiff did not complain of rib pain. (Exhibit N, Medical BS# 243)

41.     On September 13, 2017, at 4:09 p.m., Plaintiff was seen by medical for reopening his wounds and a post use of force exam. He was combative and did not complaint of rib pain. (Exhibit N, Medical BS# 254)

42.     On September 13, 2017, at 5:15 p.m. Plaintiff was physically able to break off the sprinkler head that was in his cell and was able to break the heater off his cell wall and use the heater to bang on his cell door. It took three applications of chemical agents to control Plaintiff. At 5:42 p.m. plaintiff was assessed for a post use of force with a chemical agent. Plaintiff did not complain of rib pain. (Exhibit N, Medical BS# 255) (Exhibit R, Insp Gen BS# 370, 371)

43.     On September 16, 2017, Plaintiff was admitted to Fawcett Memorial, an outside hospital, for treatment of the right arm laceration. (Exhibit S, Fawcett BS# 376).

44.     On September 21, 2017, thirty-seven (37) days after the incident, Plaintiff went to Fawcett for self-inflicted wounds. Plaintiff also had a chest x-ray done which reflected he had a mildly displaced fracture of the left lateral 9th rib. There is no mention about the 10th rib. (Exhibit N, Medical BS# 253) (Exhibit S, Fawcett BS# 378) (Exhibit M, Nurse Caswell Aff. BS# 92, ¶21-26)

45.     On October 15, 2017, Plaintiff "jumped out of bed and swung at the officers"; he was seen by medical for a use of force exam and did not complain of rib pain. (Exhibit N, Medical BS# 241, 259)

46.     On October 16, 2017, Plaintiff was seen by medical for complaints of side pain, that his ribs hurt. Medical noted a small abrasion to the left side of his abdomen that was tender to the touch and generalized bruising. (Exhibit N, Medical BS# 239, 240)

47.     On October 20, 2017, Plaintiff had an xray of his left and right ribs which showed a healing left 9th rib fracture and nonunion 10th rib fracture. (Exhibit N, Medical BS# 206, 239, 240)

48.     On November 22, 2017, Plaintiff was seen by medical and stated, "right ribs hurt like left

ribs" Plaintiff denied shortness of breath and was able to talk in full sentences. There was no redness, bruising, or swelling documented in the exam notes. (Exhibit N, Medical 238)

49.     On November 29, 2017, Plaintiff had a rib x-ray that shows *acute* fractures in the left 9th and 10th ribs. Acute is different than non-healing or chronic, acute appears rapidly. (Exhibit N, Medical 205) (Exhibit M, Nurse Caswell Aff. BS# 93, ¶26)

50.     Plaintiff falsely listed James Logan as a witness to this incident. (Exhibit D, Incident BS# 41, 40, Sec VI) Logan was never housed at Charlotte but was listed by Plaintiff as a witness to six other instances at Charlotte. (Exhibit U, Logan BS# 382-387, listed by Plaintiff; BS# 388-405, FDC investigation)

## C.  MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

All Defendants are entitled to summary judgment in this frivolous lawsuit on the basis that the undisputed facts demonstrate that there was I) No failure to Protect, II) Lack of Excessive Force, III) No Duty to Intervene, IV) No Deliberate Indifference to Medical Need, V) Qualified Immunity is Applicable and VI) Plaintiff Failed to Exhaust prior to filing suit.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Disputes among non-genuine issues of fact will not stop the granting of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party has the initial burden to prove the absence of any genuine issues of material facts; next, the non-movant must prove that there are issues of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-movant must show through Aff.s, depositions, and discovery, genuine factual issues. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "When opposing parties tell two

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

### I)   NO FAILURE TO PROTECT

Prisoners are not to be subjected to 'cruel and unusual punishment'. U.S. Const. Amend VIII. A prison condition is permitted to be uncomfortable, but not inhumane; not every injury suffered by an inmate equates to a violation. Purcell ex rel. Estate of Morgan v. Toombs County, Ga, 400 F.3d 1313, 1319 (11th Cir. 2005). An officer is not a "guarantor of a prisoner's safety". Id at 1321, FN 15, quoting Farmer v. Brennan, 511 U.S. 825 (1994). In a failure to protect claim, the non-movant "must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Purcell at 1319. (internal citation omitted) "[P]laintiff must show both that the defendant actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm and that the defendant disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner." Bowen v. Warden Baldwin State Prison, 826 F.3d 1312, 1320 (11th Cir. 2016)(Internal citations omitted)

"The known risk of injury must be a strong likelihood, rather than a mere possibility..." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citation omitted). A risk is substantial when it is "sufficiently serious" and the conditions are "extreme and pose[d] an unreasonable risk of serious injury to his future health or safety." Lane v. Philbin, 835 F.3d 1302, 1307 (11th Cir. 2016).

Deliberate indifference is "not inadvertence or error in good faith" but is the presence of "obduracy and wantonness". Whitley v. Albers, 475 U.S. 312, 312 (1986). Plaintiff must show that the officer **had actual knowledge of facts** which would cause him to **reasonably** conclude

and infer that there was an actual risk, not a mere possibility, of substantial harm and disregarded that risk; hindsight cannot be considered. Purcell at 1319–20. See Marbury v. Warden, 936 F.3d 1227, 1236 (11th Cir. 2019) Deliberate indifference is more than gross negligence. Losey at 789.

"[A]n official's failure to alleviate a significant risk that he should have perceived but did not" is not causation. Farmer v. Brennan, 511 U.S. 825, 838 (1994). The actions, or inactions, by the officer must be more than a contributing factor; they must be the reason for the violation LaMarca v. Turner 995 F2d 1526, 1538 (11th Cir. 1993).

Plaintiff alleged in his deposition that he complained to Willis on August 11, 2017 in the morning and to Williams on August 11, 2017 between 12:00 p.m. and 3:30 p.m. (Exhibit S, page 37, lines 2-25) The facts show that Plaintiff never made any claims to Willis or Williams regarding threats by Dischiavo and Traupman. [ECF 1, pf 12] Both Willis and Williams deny ever speaking with Milledge regarding any threats by these officers. Further, Williams was in her officer answering, reading, and drafting 60 emails during the alleged times.

Even if Plaintiff did report that the officers were threatening him because Plaintiff files lawsuits and 'snitches' such claims do not rise to the level of strong likelihood ,as opposed to a mere possibility, of a substantial risk of safety, nor are there allegations that the complaints were of a significant risk rising to the level of a deliberate indifference. Even if Plaintiff was subjected to excessive force, such was not *caused* by the action or inaction my Willis and Williams. Plaintiff never filed a grievance about these threats, evidencing the fact that there was no fear or real risk. In the context of a prison setting, it is not unreasonable for inmates to present with a paranoia or generalized fear of officers and staff due to their control on an inmate's every movement and freedom. Plaintiff does not allege that Dischiavo and Traupman had actual knowledge of Plaintiff snitching or filing lawsuit, which further evidences, there were no threats at issue.

Plaintiff's never sought protection from Willis and Williams, Plaintiff never was assaulted by Dischiavo or Traupman. There can be no violation for a failure to protect, as there was nothing to protect Plaintiff from.

## II)   LACK OF EXCESSIVE FORCE

Excessive force is the application by an officer of an "unnecessary and wanton infliction of pain..." Hudson v. McMillian, 503 U.S. 1, 5 (1992). The test applies two views, first, an objective view in determining if the wrongdoing was "harmful enough" and secondly, a subjective view as to whether the pain inflicted was unnecessary and wanton and done so in a maliciously and sadistically manner or whether it was applied in a good faith to restore and maintain discipline. Hudson at 2, 21, 23. Five factors are evaluated whether the force was malicious and sadistic: "(1) the need to apply force, (2) the relationship between that need and the amount of force applied, (3) the threat reasonably perceived by the responsible officials, and (4) any efforts made to temper the severity of the forceful response." Moore v. Hunter, 847 Fed. Appx. 694, 698 (11th Cir. 2021); See Whitley v. Albers, 475 U.S. 312, 321 (1986).

In deciding if there's a threat of safety to staff and inmates, it's the reasonable perception of the officer which is analyzed based upon the facts known to him at the time and "any efforts made to temper the severity of a forceful response." Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (internal citation omitted). The officer's "perceptions and attendant actions…is a question of law for the court". Simmons v. Bradshaw, 879 F.3d 1157, 1164 (11th Cir. 2018).

Officers are permitted to use force and leeway is given to them when trying to control a prisoner. Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990). "Prison policies and practices must preserve internal order and discipline and to maintain institutional security." Hudson at 6. "Since problems that arise in the day-to-day operation of a corrections facility are not susceptible

of easy solutions, prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979). See <u>Bennett</u> at 1533. Plaintiff must provide evidence that "goes beyond a mere dispute over the reasonableness of the force used and [that] will support a reliable inference of wantonness in the infliction of pain." <u>Brown v. Smith</u>, 813 F.2d 1187, 1188 (11th Cir. 1987).

Claims of closing a cell doors flap on an inmate's hands or fingers, do not amount to excessive force. <u>Johnson v. Moody</u>, 206 Fed. Appx. 880, 884 (11th Cir. 2006) (no excessive force where officer kicked a food tray closed on an inmate's arm, resulting in bandages, swollen arm, pain medication, tetanus shot, and pain for months). <u>Moore v. Nunn</u>, 2019 WL 7485332, at *6 (N.D. Fla. Aug. 27, 2019), <u>report and recommendation adopted</u>, 2020 WL 61044 (N.D. Fla. Jan. 6, 2020) (no excessive use of force where officer shut flap on an inmate's arm and hand after he refused to remove his arm out of the flap. Injury to two fingers and forearm resulting in swelling, bruising, and pain was de minimis.) <u>Minnis v. Pittman</u>, 2018 WL 3974112, at *14 (M.D. Fla. Aug. 20, 2018), (no excessive force when an officer closed the food tray flap on an inmate's hand which did not result in evidence of injury; even if there was pain and difficulty writing with his hand as a result of the flap being closed on the hand). <u>Green v. Pineda</u> 1:19-cv-22444, Order ECF 131, (SDFL July 6, 2021) (no excessive force where officer closes flap resulting in laceration).

The record evidence is clear that Cherry and Traupman were not involved in this matter. The documentation submitted, created both at the time and after litigation, shows the only people present in the training room were Dischiavo, Sperling, Barrett, and Cotte.  Traupman and Cherry were never identified because they were not there. The compound was short staffed that day and

the Cherry, as a female officer, would not have been present for a strip search. See Fla. Admin. Code Ann. r. 33-602.204;

Although Plaintiff claims it was Traupman who found the knife, the FDC paperwork identifies Sperling as the officer who found the knife and escorted Plaintiff to the activities room. It is implausible to believe that Sperling would falsely identify himself as involved in the incident.

The record also shows that Barrett and Cotte, never partook in the force, but rather responded minutes after Plaintiff was on the ground. Barrette confirms this with his lead in statement, that he was off the compound and just reported to the incident. It is also implausible that Cotte would have engaged in this alleged attack, and then start recording the inmate.

The force exerted upon Plaintiff in the training room by Dischiavo was not excessive. Plaintiff was found with a 7-inch knife down the front of his pants and had to be searched for obvious safety reasons. Once Plaintiff became combative, there existed a need to control him, and force was applied. Controlling Plaintiff required that he be taken to the ground in order to restrict his movements. The moment Plaintiff was controlled, he was brought to his feet and taken to medical.

The facts show that Plaintiff was aggressiveness, non-compliant, assertive, vile, and disobedient. Plaintiff intentionally and deliberately spit in the face of Dischiavo; Plaintiff refused to identify himself, Plaintiff threatened the nurses when they refused to take off his spit shield, and Plaintiff falsely claims a psych emergency. Plaintiff was not cooperative, compliance, or in control on August 15, 2017. All force applied was proper and appropriate.

Regardless of whom Plaintiff claims used excessive force upon him in the training room, his lack of injuries prove he was not assaulted. His claims that he was 'kicked in the head, ribs, back and other parts of his body' [ECF 1, pg 13] are not at all depicted in the video. He is not

sweating, is not breathing heavily, is not bruised, is not cut, is not limping, is not calling out in pain, although he argues on camera, he never claims he is injured. His actual physical condition does not equate to his alleged claims. Plaintiff was able to physically walk across the compound with no issues and then physically able to turn his torso in order to spit in Dischiavo's face; Plaintiff was not injured and his rib was not broken. Plaintiff's lack of injuries, after five different officers allegedly took turns assaulting him, demonstrate there was no excessive force used. The video shows clear as day, that there was no excessive force used upon Plaintiff even after he spit in Dischiavo's face; he was quickly taken to the ground with minimal force, placed in a spit shield and brought to medical. The control demonstrated by Dischiavo after another human spat in his face if commendable and proves there was no excessive force used that day.

At no point in time did Brooks apply force upon Plaintiff that evening. Plaintiff was taken to medical after declaring a psychological emergency, without incident and returned to his cell. Plaintiffs claims that his hands were closed in the flap are without merit, like the rest of his claims. The medical records never show any complaints about his hands or fingers. Even if Brooks closed the flap on Plaintiff, such has been ruled by the courts as not excessive force. Plaintiff's complaint alleges that he complained to Garhmann about injuries to his hand, had Plaintiff been assaulted by Brooks, his complaints to Gahrmann would have been about his entire body, not about his hands.

As seen in the records, Plaintiff has made complaints of physical injuries before and after this incident. The x-rays in this case were taken after three other instances in which the Plaintiff exerted enough strength, and physical capacity that makes any claim of injury implausible. Plaintiff was strong and well enough and without any disability or impairment, or broken rib, to **physically rip a heater and a sprinkler off of his cell walls with his own hands, and then use the heater to bang on the cell walls.** An individual who is suffering from a broken rib cannot do

this. Plaintiff continued to exert his strength by taking a bed mattress, lifting it, and barricading his cell window to avoid control of officers. Plaintiff was strong enough that it took five extraction team members to take him out of his cell. All of these instances occurred within *four weeks* of this alleged incident. Plaintiff was not injured on August 15, 2017, because no excessive force was used upon him.

Despite submitting a request to be seen by medical for eye, rib, and back pain; Plaintiff refused to be seen by medical on August 17, 2021 and on August 25, 2017 for same. Plaintiff merely filed the request to create a false paper trial.

Plaintiff was x-rayed 37 (thirty- seven) days after the alleged incident which showed only a fracture of the 9th rib, *not* of the 10th rib. He was involved in numerous physical altercations between August 15, 2017 and September 21, 2017. Plaintiff's injuries to his 9th rib were not caused by the allegations in this suit, but were present as indicated by his complaints of middle back pain on August 3, 2017 and continued to result from his continuous fighting and exertion of physical activity and strength after August 15, 2017.

Plaintiff refused to answer questions in his deposition regarding his physical condition before and after this instance. It unknow the full extent of physical altercations Plaintiff was involved in, including with other staff, other inmates, and prior to coming to FDC. Upon Defendant's motion, the Court granted a second deposition so Defendants could inquire. Despite the Order, Plaintiff refused to partake in the deposition. Defendants have filed motions regarding said conduct, however, said has not been ruled upon as of the filing of this motion, which is on a Court-imposed deadline. [ECF 158, 211, 240, 232] Based upon Plaintiff's failure to supply such information, the matter of the Plaintiff's injury should be viewed in the light most favorable to Defendants. Plaintiff has deliberately and intentionally hindered the defense discovery.

### III)   <u>NO DUTY TO INTERVENE</u>

A duty upon an officer to intervene and stop excessive force is only applicable when the officer: a) is actually present at a scene, b) can observe that excessive force is being used upon an individual by another officer, and c) the officer fails to take reasonable steps to protect the said individual, <u>Priester v. City of Riviera Beach, Fla.,</u> 208 F.3d 919, 924 (11th Cir. 2000). If an officer is not in a position that makes it possible to intervene, he cannot be held liable. <u>Id</u>. There is no duty to intervene when the force observed by the officer was not excessive. <u>Mobley v. Palm Beach County Sheriff Dept.,</u> 783 F.3d 1347, 1357 (11th Cir. 2015). See <u>Crenshaw v. Lister</u>, 556 F.3d 1283, 1294 (11th Cir. 2009).

Plaintiff is fully aware that an officer who views excessive force, but who is stationed in a secured, prison control room, is prohibited from leaving the control room, and is thus not under a duty to intervene. <u>Milledge v. McNeil</u>, 2020 WL 619084, at *4 (M.D. Fla. Feb. 10, 2020)[3]

Because there was no excessive force used regarding the training room and transfer to medical, there could not have been any duty to intervene on behalf of Barrett. Because Barrett did not enter the room until Plaintiff was already secured on the ground, there was no excessive force observed, and no duty to intervene.

In regard to the night incident, as Brooks did not engaged in excessive force when he took Plaintiff out of his cell, brought him to medical, and returned him to his cell, there could not have been any duty imposed upon Gahrmann to intervene. Even if force was used, Gahramann was stationed in the control room, which for safety and security reasons, could not be left unattended, thus he was not in a position to intervene. Gahrmann did not observes any excessive force; even if

---

[3] Plaintiff has previously made the same claim in another §1983 case against an FDC officer of failure to intervene when the officer was in a control room and Milledge was allegedly being assaulted by another officer. Control room officer dismissed at MSJ stage. 3:14-CV-248-J-32MCR

excessive force was used, without knowledge that it was occurring, Gahrmann was not under a duty to intervene.

### IV)   <u>NO DELIBERATE INDIFFERENCE TO MEDICAL NEED</u>

When there is a deliberate indifference to a serious medical need which results in an unnecessary and wanton infliction of pain, there may be an Eight Amendment violation. <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and "if left unattended, pos[es] a substantial risk of serious harm." <u>Brown</u> at 1351 (internal citations omitted).

Deliberate indifference requires Plaintiff prove that the officer had a "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." <u>Brown</u> at, 1351.

Summary judgment is warranted where Plaintiff cannot prove the defendant was subjectively aware of the risk. <u>Sears v. Warden Okeechobee Corr. Inst.</u>, 762 Fed. Appx. 910, 918 (11th Cir. 2019). In finding whether or not there is a violation, the reason for the delay and "the nature of the medical needs are relevant." <u>Id</u>. Where the claim is that the delay in treatment is the violation, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1188–89 (11th Cir. 1994).

Plaintiff did not complaint to Gahramann about injuries to his hands and fingers from being closed on the flap, and therefore, Gahrmann had no knowledge of an injury. Even if Plaintiff did complaint of injuries to his hands and fingers, such are not a serious medical need. This is shown by Plaintiff's failure seek medical attention after the incident. Plaintiff did submit medical requests

but refused to be seen by medical on August 17, 2021 and on August 25, 2017. Throughout the subsequent medical records, Plaintiff never complained about injuries to his hands and fingers.

## V)   <u>QUALIFIED IMMUNITY</u>

To be afforded qualified immunity, an officer must shows that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred…by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." <u>Courson v. McMillian</u>, 939 F.2d 1479, 1487 (11th Cir. 1991)(internal citation omitted). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed. The qualified immunity inquiry's concern, on the other hand, is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. An officer might correctly perceive all of the relevant facts, but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances." <u>Saucier v. Katz</u>, 533 U.S. 194, 195 (2001).

Once met, the Plaintiff may overcome the immunity by showing a "lack of good faith" on behalf of the officer by showing that the law was clearly established at the time in regards to the claims, and that the officer knowingly violated the this clearly established law. <u>Courson at</u> 1487-88. However, qualified immunity should be favored, and granted freely. "The qualified immunity doctrine means that government agents are not always required to err on the side of caution." <u>Lassiter v. Alabama A & M Univ., Bd. of Trustees</u>, 28 F.3d 1146, 1149 (11th Cir. 1994). It is the norm, not the exception, to afford an official qualified immunity. <u>Id</u> at 1149.

Willis and Williams were never spoken to by Plaintiff regarding fear of staff. Even if they were, their decision to act, or not, was in the scope of their discretionary duties. Perceiving all

events, along with the unstableness of Plaintiff, and the unbelievable, unsubstantiated, unsupported comments claimed, it would not have been  a violation to disregard the allegations.

Dischiavo acted reasonably and within the scope of his duties. He was faced with a combative, dangerous, inmate, who was just found in possession of a weapon and was refusing to comply with his order. Controlling the Plaintiff for the safety and security of himself, his fellow officer was a lawful basis to utilize force, which was not excessive but was equal to the need to control the situation within the training room. The video also shows the actions by Dischiavo after Plaintiff spit in his face, were discretionary and within the scope of his duties.

Traupman and Cherry were not present and Cotte did not engage in any force upon Plaintiff. Barrett did not view any excessive force. Even if Plaintiff can make out a scenario that they were all  there, they are all entitled to qualified immunity. Plaintiff was found with a weapon on him, he was resisting control, he was refusing to be strip searched. His injuries and actions after the instance are not consistent with excessive force being applied. Any actions taken by the officers, through the officers perspective, were lawful and are afforded qualified immunity.

Brooks assisted Plaintiff by taking him to medical due to a psychological emergency and returned him to his cell. None of his actions resulted in force being applied. Brooks is entitled to qualified immunity s all his actions were lawful through his perspective of the fact that he was handling an inmate who was aggressive, disregarded orders, non-compliant and had just spit in an officer's face earlier.

He never saw any force being applied, and if he did, he was not able to leave his position. Through his view of events, he acted in a reasonable manner which afford him immunity Although never actually complained of, had Plaintiff complained of hurt figures and hands, given the

perspective of Gahrmann, and the type of injury claimed, he made a proper discretionary decision to deny medial attention.

All Defendants are entitled to qualified immunity as a matter of law.

## VI)   <u>FAILURE TO EXHAUST</u>

Prior to filing a §1983 action, Plaintiff was required to properly exhaust his administrative remedies. 42 U.S.C.A. § 1997e, See <u>Chandler v. Crosby</u>, 379 F.3d 1278. The PLRA requires strict and proper compliance with the rules and polices of each correctional institution's grievance procedure. <u>Hardin v. Jones</u>, 2020 WL 325649, at *2 (M.D. Fla. Jan. 21, 2020); See <u>Brown v. Sikes</u>, 212 F.3d 1205, 1207 (11th Cir. 2000).

The authority to require FDC inmates to adhere to the grievance and exhaustion procedure is promulgated under § 944.09(1)(d), Fla. Stat. Florida's grievance procedures are codified in Chapter 33 of the Florida Administrative Code. A grievance is "A **written** complaint or petition, either informal or formal, by an inmate concerning an incident or condition within an institution, facility, or the Department which affects the inmate complainant personally." Fla. Admin. Code R. 33-103.002(6) (emphasis added). Grievances and appeals are required to be **in writing** in order to "provide a written record in the event of subsequent judicial or administrative review." Fla. Admin. Code R. 33-103.001(1). Florida's grievance procedure is a three-level process; 1) *informal*, 2) *formal*, and 3) *appeal* and the inmate must exhaust all three levels before proceeding in civil court. Fla. Admin. Code § 33-103.007(1).

An *informal* grievance must be filed within 20 days of the incident and is reviewed and responded to by a designated member of FDC. Fla. Admin Code R. 30-103.011(1)(a); 33-103.002(12). A *formal* grievance must be filed 15 days from the date the informal grievance was responded to and is reviewed and responded to by the warden or assistant warden. Fla. Admin.

Code R. 33-103.011(1)(b); 33-103.002(5). An *appeal* must be filed within 15 days from when the inmate receives the answer to his formal grievance and is reviewed and responded to by a person designated by the Secretary of FDC. Fla. Admin. Code R. 33-103.011(1)(c); 33-103.002(7).

There are certain exceptions which permit an inmate to bypass either the informal or formal level[4]. Included in the exceptions which Defendants contend is not applicable here, is a grievance of an emergency nature. An emergency grievance is a "grievance of those matters which, if disposed of according to the regular time frames, would subject the inmate to substantial risk of personal injury or cause other serious and irreparable harm to the inmate." Fla. Admin. Code R. 33-103.002(4). Where there is an emergency nature, the inmate may skip the informal process and go to the formal level, or may skip the formal, and go directly to an appeal. Fla. Admin. Code R. 33-103.005(1) and 33-103.007(3). An emergency grievance must be filed within 15 days of the incident. 33-103.11(1)(b) and (c).

Once an inmate has exhausted all three levels, informal, formal, and appeal, the matter is deemed approved. At times FDC may refer the matter to the inspector generals office. Where the response indicates that referral has been made, but that inmate may conitue in the grievance process, the matter is not exhausted. Hope v. Walker, 2015 WL 5190435, at *5 (N.D. Fla. Aug. 18, 2015), report and recommendation adopted, 2015 WL 5190615 (N.D. Fla. Sept. 4, 2015). When a referral is made to the IG and the grievance response affirmatively reflects that the matter is approved based upon the referral, exhaustion has been made. Luckey v. May, 2016 WL 1128426, at *11 (N.D. Fla. Feb. 17, 2016), report and recommendation adopted sub nom. Luckey v. Officer May, 2016 WL 1169481 (N.D. Fla. Mar. 22, 2016)

An inmate may only address one issue or complaint in a grievance. A grievance may be

---

[4] For a full list of exceptions see Fla. Admin. Code R. 33-103.005(1) and 33-103.007(3).

returned to an inmate if it lists more than one issue or complaint. Fla. Admin. Code R. 33-103.014(1). Only one issue or complaint allowed to be addressed in an informal, formal, or appeal grievance. Fla. Admin. Code R 33-103.005 and 33-103.007(4)(f).

Plaintiff never filed any written grievances, at any level, claiming that Dischiavo or Traupman had threatened him. It is inconsequential that Plaintiff, allegedly, complained to the Willis and Williams.

Before Plaintiff could have filed suit against Willis and Williams, he was required to have exhausted his claims of failure to protect. Plaintiff did not file any grievances as to Willis and Williams. It is inconsequential that plaintiff, allegedly, verbally alerted them. The rules require written form.

Before filing suit against Brooks and Gahraman, Plaintiff was required to exhaust his administrative remedies for claims of excessive force, failure to intervene, and deliberate indifference to medical need.  As the 'injury' already allegedly occurred, there could be no reason to skip the grievance levels Plaintiff was required to first file an informal grievance. Instead, Plaintiff filed a direct appeal, trying to claim 'reprisal'. A grievance of reprisal is "A grievance submitted by an inmate alleging that staff have taken or are threatening to take retaliatory action against the inmate for good faith participation in the inmate grievance procedure." Fla. Admin. Code Ann. r. 33-103.002(9). As such was not proper, his grievance was returned as denied. Plaintiff never corrected the issue and failed to exhaust as to Brooks and Gahrman.

Although Plaintiff filed a grievance regarding the instances in the activities room that occurred on August 15, 2017, he failed to include the instance with Williams and Willis which occurred before August 15th and he failed to include the instance related to the nighttime matter with Brooks and Gahrman.

Filing one grievance, is not a catchall to include and all issues while at FDC. The complaint alleges three separate and distinct instances: 1) *the conversation* 2) *the training room incident* and 3) *the evening callout*. Plaintiff was required to exhaust all three instances separately and fully. He failed to do so. His claims against Willis, Williams, Brooks, and Gahrmann must be dismissed for failure to exhaust a required by the PLRA.

**WHEREFORE**, Defendants, respectfully request this Court issue an ordering granting summary judgment in favor of the Defendants and dismiss this action with prejudice.

Respectfully submitted,
ASHLEY BROOKE MOODY
FLORIDA ATTORNEY GENERAL

**Melissa Lynn Eggers**
MELISSA LYNN EGGERS (Fla. Bar No. 072506)
Assistant Attorney General
Melissa.Eggers@myfloridalegal.com
Office of the Attorney General
1515 North Flagler Drive, Suite 900
West Palm Beach, FL 33401
(561) 268-5218
Attorney for Defendants

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing was served by US Mail specified on July 29, 2021, on all counsel or parties of record on the Service List below.

*Melissa L. Eggers*
Melissa L. Eggers
Assistant Attorney General

**SERVICE LIST**

Corey Milledge, DC# Q12023
Santa Rosa Prison
5850 E. Milton Road
Milton, FL 32583
Via U.S. Mail

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:18-cv-413-JLB-NPM

COREY MILLEDGE,
        Plaintiff,

v.

WILLIS, et al.,
        Defendants.
_____/

**<u>DEFENDANTS' EXHIBIT INDEX</u>**

The following exhibits have been included with Defendants' Motion for Summary

Judgment. Exhibits A-U contain a Bates Stamp ('BS') on the bottom right side of each page

noted as *Def MSJ BS# __*. Citations to all exhibits include the BS page number.

| LETTER | TITLE | BATES STAMP # |
|---|---|---|
| Exhibit A | Inmate Details | 001 – 003 |
| Exhibit B | Willis Interrogatories | 004 - 014 |
| Exhibit C | Williams Affidavit | 015 – 018 |
| Exhibit D | Incident Records | 019 – 050 |
| Exhibit E | Dischiavo Interrogatories | 051 - 058 |
| Exhibit F | Picture of Knife | 059 - 061 |
| Exhibit G | Barrett Affidavit | 062 - 064 |
| Exhibit H | Still Photos from Video | 065 - 080 |
| Exhibit I | Cotte Affidavit | 081 - 082 |
| Exhibit J | Use of Force | 083 - 087 |
| Exhibit K | Traupman Affidavit | 088 |
| Exhibit L | Cherry Affidavit | 089 |
| Exhibit M | Nurse Caswell Affidavit | 090 - 192 |
| Exhibit N | FDC Medical Records | 193 - 259 |
| Exhibit O | Brooks Interrogatories | 260 - 264 |
| Exhibit P | Gahrmann Affidavit | 265 - 266 |
| Exhibit Q | Grievances | 267 - 298 |
| Exhibit R | Appeals | 299 - 335 |
| Exhibit S | Inspector General Records | 336 - 371 |
| Exhibit T | Fawcett Memorial Hospital Records | 372 - 379 |
| Exhibit U | James Logan | 380 - 405 |
| Exhibit V | Dec. 28, 2020 Deposition Transcript of Plaintiff | |
| Exhibit W | Video | See ECF 248 |

Respectfully submitted,
ASHLEY BROOKE MOODY
FLORIDA ATTORNEY GENERAL

**<u>Melissa Lynn Eggers</u>**
MELISSA LYNN EGGERS (Fla. Bar No. 072506)
Assistant Attorney General
Melissa.Eggers@myfloridalegal.com
Office of the Attorney General
1515 North Flagler Drive, Suite 900
West Palm Beach, FL 33401
(561) 268-5218
Attorney for Defendants